Jessie STEWART, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–1128.

United States District Court, District of Columbia.

Dec. 9, 1976.

Dorsey Evans, David R. Taxin, Washington, D. C., for plaintiff.

Tobey W. Kaczensky, Asst. U. S. Atty., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

This is a suit under the Federal Tort Claims Act for damages resulting from an allegedly false arrest made by officers of the Federal Protective Service while on traffic detail at the Navy Yard.

Plaintiff, an off-set press operator employed by the Library of Congress, left his customary parking lot in the Navy Yard and proceeded the wrong way down a road which gave him a shortcut to the main street. Others using the lot were doing the same thing at the same time, and this had been a common practice for several weeks. Police connected with the Federal Protective Service were strategically placed to stop misuse of this and other shortcuts in the area. They were under the command of Captain Samuel A. Stewart, an experienced police officer of 18 years' service who was on a plainclothes assignment and dressed in a pink jump suit without a badge. As cars coming the wrong way reached the main street they were pulled over, and ticketing proceeded in careful, leisurely manner. Plaintiff, who had to pick up his wife and was in a hurry, got out of his car and voiced complaints.

Captain Stewart was attracted to the scene and his identity made known to plaintiff by one of the uniformed officers. The Court finds from conflicting testimony that something approximating the following confrontation occurred, substantially in the words indicated:

Plaintiff: What's the problem, man? You mind telling us?

Captain
Stewart: I'm giving you a ticket—one way.

Plaintiff: (Loud voice). I got to go. Give me a ticket. I'm wrong. Go ahead or I'll get in my car and go.

Captain
Stewart: We're not responsible for when you got to go. We don't do things your way, but our way. Calm down or you are going to get yourself locked up.

(Captain Stewart walks away, believing plaintiff has calmed down.)

Plaintiff: (Loud voice). Lock me up, m _ _ _ f _ _ _, lock me up you jive-ass cop. I'm leaving you m _ _ _ f _ _ _ ing pink jump suit wearer.

Captain
Stewart: What you say! What you say! What you say! Now you're going to jail sure enough.

Captain Stewart grabbed plaintiff, placed a hammerlock on him and twisted him around against a car. Handcuffs were applied with the aid of another officer, and plaintiff was eventually transported to the Second Precinct where he was charged with a traffic violation and disorderly conduct. Plaintiff offered no resistance but continued to verbalize. At the police station the disorderly conduct charge was dropped, and plaintiff was released in about 45 minutes after posting $10 collateral for the traffic offense.

Captain Stewart had no crowd problem when he ordered plaintiff's arrest for disorderly. He did not consider the crowd hostile. Only a few casual observers, not more than six, were present, and they were not involved. Plaintiff did not seek to provoke them in any way and Captain Stewart did not have any reason, as he suggests, to be concerned for the safety of his fellow officer, Johnson.

Captain Stewart did not react because he had any genuine concern that plaintiff would actually leave the scene or that a breach of the peace was threatened. He reacted solely because of plaintiff's derogatory, obscene remarks. There were no racial overtones. Plaintiff and the police officers were all black.

Thus, on this state of facts, the Court is required to determine whether there was probable cause for the disorderly arrest which was the reason for handcuffing and transporting plaintiff to the precinct.

The local "disorderly conduct" statute, D.C.Code § 22–1107, reads as follows:

§ 22–1107. Unlawful assembly—Profane and indecent language

It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure; it shall not be lawful for any person or persons to curse, swear, or make use of any profane language or indecent or obscene words, or engage in any disorderly conduct in any street, avenue, alley, road, highway, public park or inclosure, public building, church, or assembly room, or in any other public place, or in any place therefrom the same may be heard in any street, avenue, alley, road, highway, public park or inclosure, or other building, or in any premises other than those where the offense was committed, under a penalty or not more than $250 or imprisonment for not more than ninety days, or both for each and every such offense. July 29, 1892, ch. 320, § 6, 27 Stat. 323; July 8, 1898, ch. 638, 30 Stat. 723; June 29, 1953, ch. 159, § 210, 67 Stat. 97.

This provision has been construed in *Williams v. District of Columbia,* 136 U.S.App. D.C. 56, 419 F.2d 638 (1969), to require that profane or obscene language spoken in public must threaten a breach of the peace either because the language "creates a substantial risk of provoking violence" or grossly offends members of the public who hear it so as to amount to a nuisance under "contemporary community standards."

■ Any trial judge in this city is obliged to state, sad as it may be, that plaintiff's language, under the test suggested, was not grossly offensive to those fellow workers and passers-by who may have heard it. M____ f____ is an everyday expression that punctuates everyday street language. The term has been "debased by overuse to non-meaning." *

Accordingly, the issue of probable cause comes down to whether or not the plaintiff's loud protestations created a substantial risk of provoking violence.

"A policemen's lot is not a happy one," as we all know. Although the stability of society in a large urban area such as the District of Columbia depends upon the constant vigilance and tact of the police, they are customarily vilified and harassed by some elements without apparent cause. It takes strength of character and a hide as thick as a rhinoceros to withstand the abuse heaped on police officers in some sections of this city as they go about their daily work. This condition should not exist and the urge to come to the support of the occasional officer, such as Captain Stewart, who "looses his cool" in the face of this type of harassment is very strong. The Court must leave its personal distaste for plaintiff's conduct behind for the precedents are controlling.

■ While the line is difficult to draw, the Supreme Court has established a strict test to protect First Amendment values. To justify a disorderly or similar arrest the words uttered must be lewd, obscene, insulting, fighting words which tended by their very nature to incite a breach of the peace. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Rosenfeld v. New Jersey,* 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972), *vacating and remanding,* 59 N.J. 435, 283 A.2d 535.

There are two considerations which underly this view. As Justice Powell noted in his concurring opinion in *Lewis v. City of*

* *Von Sleichter v. United States,* 153 U.S.App. D.C. 169, 472 F.2d 1244, 1248 (1972).

*New Orleans,* 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972):

> Under *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the issue of a case of this kind is whether "fighting words" were used. Here a police officer, while in the performance of his duty, was called "G____ D____ M____ F____" police.

> If these words had been addressed by one citizen to another, face to face and in a hostile manner, I would have no doubt that they would be "fighting words." But 'the situation may be different where such words are addressed to a police officer trained to exercise a higher degree of restraint than the average citizen. . .

There is, moreover, a basic philosophical aspect. Justice Harlan recognized the problem when he said in *Cohen v. California,* 403 U.S. 15, at 24–25, 91 S.Ct. 1780, at 1788, 29 L.Ed.2d 284 (1971):

> To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. That is why "[w]holly neutral futilities * * * come under the protection of free speech as fully as do Keats' poems or Donne's sermons," * * * and why "so long as the means are peaceful, the communication need not meet standards of acceptability," * *."

Accordingly, the Court concludes that the disorderly arrest was without probable cause and judgment must be entered for plaintiff. Plaintiff's verbal conduct did not create a substantial risk of violence. He did not use fighting words.

 Plaintiff makes no exaggerated claims for his damages. He had never been arrested. He was shaken up. He was detained for an hour, largely in handcuffs. He was humiliated before his fellow workers and later took a lot of kidding. He was distressed because he didn't pick up his wife. He had a sore neck for three days and lost some sleep but no work. The thing greatly "got next to him" and did something to his system for a time. It was not a pleasant experience, and fortunately the good sense of the Metropolitan Police Officers at the Second Precinct corrected Captain Stewart's mistake promptly. Weighing all these factors, the Court will award $1,000 in compensation, plus costs, for plaintiff's humiliation, discomfort and distress.